UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 23-80046-CR-MARRA

UNITED STATES OF AMERICA

vs.

SHANON MEHKI SMITH,

   Defendant.
_____/

## PLEA AGREEMENT

  The United States Attorney's Office for the Southern District of Florida ("this Office") and SHANON MEHKI SMITH (hereinafter referred to as the "defendant"), enter into the following agreement:

  1. The defendant agrees to plead guilty to Count 1 of the Indictment, which charges the defendant with attempted bribery of a public official, in violation of Title 18, United States Code, Section 201(b)(1)(C).

  2. The United States agrees to seek dismissal of Count 2 of the Indictment after sentencing.

  3. The defendant is aware that the sentence will be imposed by the Court after considering the advisory Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a pre-sentence investigation by the Court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the Court may depart from the

advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose a sentence within that advisory range; the Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory range. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

4. The defendant also understands and acknowledges that the Court may impose a statutory maximum term of imprisonment of fifteen (15) years, followed by a term of supervised release of up to three (3) years. In addition to a term of imprisonment and supervised release, the Court may impose a fine of up to $250,000.

5. The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 3 of this agreement, a special assessment in the amount of $100 will be imposed on the defendant. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing. If a defendant is financially unable to pay the special assessment, the defendant agrees to present evidence to this Office and the Court at the time of sentencing as to the reasons for the defendant's failure to pay.

6. This Office reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's

2

background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

7. This Office agrees that it will recommend at sentencing that the Court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. If at the time of sentencing the defendant's offense level is determined to be 16 or greater, this Office will file a motion requesting an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. This Office, however, will not be required to make this motion and this recommendation if the defendant: (1) fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering into this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

8. The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, this Office, or the probation office, is a prediction, not a promise, and is not binding on this Office, the probation

office or the Court. The defendant understands further that any recommendation that this Office makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously acknowledged in paragraph 3 above, that the defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by the defendant, this Office, or a recommendation made jointly by the defendant and this Office.

9. This is the entire agreement and understanding between this Office and the defendant. There are no other agreements, promises, representations, or understandings.

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

Date: 7/28/23      By: _____
                       RINKU TRIBUIANI
                       ASSISTANT UNITED STATES ATTORNEY

Date: 7/18/23      By: _____
                       PETER BIRCH
                       ASSISTANT FEDERAL PUBLIC DEFENDER

Date: 7/18/23      By: _____
                       SHANON MEHKI SMITH
                       DEFENDANT

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-80046-CR-MARRA

UNITED STATES OF AMERICA

vs.

SHANON MEHKI SMITH,

    Defendant.

_____

## FACTUAL PROFFER

Had this case proceeded to trial, the United States would have proved beyond a reasonable doubt the following facts:

On or about January 3, 2023, USPIS received information from a Postal Letter Carrier (hereinafter "Carrier") stating that someone had reached out to the Carrier via text, offering to pay the Carrier money for providing the individual with stolen mail. On January 11, 2023, Postal Inspectors interviewed the Carrier. The Carrier stated the individual identified himself as "Brandon," who was later positively identified as Shanon Mehki Smith. According to the Carrier, Smith offered to pay the Carrier, a public official, $10,000 weekly if the Carrier, acting in her official capacity, stole mail matter to give to Smith. Smith also sent the Carrier via text message a photo of an envelope filled with money. The Carrier told Smith that the Carrier was not interested and stopped all communication with Smith by blocking his cell number. The Carrier then reached out to Postal Inspectors.

Postal Inspectors asked the Carrier to unblock Smith's number. The Carrier was instructed to notify agents if Smith ever attempted to reach out to the Carrier again. The Carrier was also

instructed to tell Smith that while the Carrier was not interested in the proposition, the Carrier may know a "co-worker" who would be interested.

On February 5, 2023, Smith contacted the Carrier by cell phone and asked if the Carrier had reconsidered Smith offer to steal mail matter in exchange for money. The Carrier negated but informed Smith that the Carrier had a co-worker who may be interested but who was on vacation at the time. The Carrier informed Smith that the Carrier would provide the co-worker with Smith's number once the co-worker returned from vacation.

On February 16, 2023, an undercover agent (UC) posing as the Carrier's co-worker texted Smith. Soon after, Smith contacted the UC via telephone and explained how the UC could get paid between $20,000 - $30,000 per month if the UC could provide Smith with stolen mail matter. Smith wanted the UC to either provide stolen checks, or 800-1500 pieces of stolen United States mail which Smith and his team would sort through. Smith texted the UC pictures of checks and an envelope filled with money. Smith claimed that he and his team earned $200,000 per week by cashing checks received by them from stolen mail.

Smith said he had a whole network of people he worked with. Smith explained that mail went missing all the time and the UC, believed by Smith to be a public official, could steal mail matter and stay under the radar. Smith explained that he (Smith) made money by cashing "glass," stolen checks obtained from the mail. The UC asked if Smith needed the UC to get him (Smith) mail. Smith affirmed and said that he and his team would sort through the mail. Smith explained that he had worked with another postal carrier for the past 2 years but had recently moved and was looking for a new postal carrier with whom to collaborate. Smith explained that the UC knew where the cameras were so the UC could easily put aside two stacks of mail matter and no one would notice. Smith reassured the UC that mail matter went missing all the time.

2

Later that evening, Smith and the UC agreed to meet the following day to discuss a plan of action.

On February 18, 2023, at approximately 7:30 p.m., the UC met with Smith at the Palm Beach Outlet Mall parking lot in West Palm Beach, Florida. Smith entered the UC's vehicle and began talking about Smith's organized operation. Smith stated to the UC, "I be cooking up checks and we be smacking hard." Smith also began to show the UC several photos of mail matter and checks contained on Smith's cell phone, as well as photos of a recent Chase Bank receipt where Smith deposited $20,000. Smith and the UC also discussed ways the UC could steal mail and Postal Arrow Keys for Smith. They agreed to meet the following week for their first exchange of stolen mail and possibly a stolen Postal Arrow Key. This meeting between the UC and Smith was audio and videorecorded.

After the meeting was conducted, Postal Inspectors and PBSO conducted moving surveillance on Smith. Smith subsequently drove to the Seminole Casino. With the assistance of Seminole Casino security, Smith was stopped and positively identified as Shanon Mehki Smith. The UC was provided with a driver's license photo of Smith and he positively identified him.

On February 21, 2023, during a series of text messages, Smith asked the UC to "focus on stashing and key." The UC said that the UC was unavailable that day. Smith asked, "Will you still be grab some stash at all today to go through?" The UC responded that the UC would stash away mail matter and meet Smith the following day after work. Smith agreed. The two agreed to meet in a Lowes parking lot.

On February 22, 2023, at approximately 5:15 p.m., the UC (dressed as a Postal Service Letter Carrier) met with Smith in the Lowes parking lot. The UC and Smith exited their respective vehicles. The UC told Smith that the UC had been unable to secure a Postal Arrow Key. Smith

3

asked the UC to try to obtain a Postal Arrow Key for a different route because Smith had other individuals who were ready to hit postal cluster boxes. The UC brought out of his vehicle the first tray of mail matter and handed it to Smith, who then placed the mail in the trunk of Smith's vehicle. The UC then retrieved the second tray of mail matter and handed it to Smith, who then placed it in the trunk of Smith's vehicle. Smith then got into his car. Before Smith could drive away, agents moved in and placed Smith under arrest.

Smith's vehicle was towed incident to arrest and a tow inventory was completed. Agents recovered in Smith's vehicle three cellular telephones, three debit cards in other person's names, and the two trays of U.S. Mail.

Smith was taken to PBSO District 9 Office and interviewed. During an approximate 90-minute post-*Miranda* interview, Smith claimed that his acquaintance named "Chase Bans" asked Smith to pick up some packages from an individual (the UC) and then deliver said packages to another unknown individual at a Publix. The unknown individual at Publix would then pay Smith $100. Smith claimed that he had never met the UC prior to being arrested, a statement known to be false. Agents played for Smith the audio of his first telephone conversation with the UC. When confronted with this recording, Smith claimed that he was not sure that it was him on the tape. It should be noted that agents listened to Smith's voice during the entirety of the interview and are certain that Smith's voice matches the voice of the individual who communicated with the UC.

### **Elements of the offense**

The elements of 18 U.S.C. § 201(b)(1)(C) are:

(1) The Defendant directly or indirectly offered or promised something of value to a public official; and

(2) The Defendant acted knowingly and corruptly, with intent to induce the public official to violate the public official's lawful duty by doing or failing to do an act.

4

Smith further agrees that these are the elements of the offense to which he is pleading guilty, and that the factual basis satisfies each and every element of the offense.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

Date: 7/28/23            By: _____
                              RINKU TRIBUIANI
                              ASSISTANT UNITED STATES ATTORNEY

Date 7/18/23             By: _____
                              PETER BIRCH
                              ASSISTANT FEDERAL PUBLIC DEFENDER

Date 7/18/23             By: _____
                              SHANON MEHKI SMITH
                              DEFENDANT

5